Filed 11/2/15  In re J.C. CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re J.C. et al., Persons Coming Under the Juvenile Court Law. | B262458 |
| | (Los Angeles County Super. Ct. No. CK97062) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Plaintiff and Respondent, | |
| v. | |
| J.A., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County.  Debra Losnick, Juvenile Court Referee.  Affirmed.

Leslie A. Barry, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, Interim County Counsel, Dawyn R. Harrison, Assistant County Counsel, and Jeanette Cauble, Deputy County Counsel, for Plaintiff and Respondent.

Marsha F. Levine for Minors J.C. and A.V.

* * * * * * * *

In this consolidated appeal, J.A. (mother) appeals from the juvenile court's February 26, 2015 order denying her petition pursuant to Welfare and Institutions Code section 388[1] in which she sought placement of her three minor children in the home of the maternal grandparents, as well as from the court's April 20, 2015 order terminating parental rights to the two older boys.[2]

We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

In November 2012, 18-month-old J.C. and four-month-old A.V. came to the attention of the Los Angeles County Department of Children and Family Services (Department) from a call to the child abuse hotline in which the caller reported the children were at risk due to general neglect, physical abuse, domestic violence in the home, and abuse of alcohol by M.V. (father V.), the father of A.V. and stepfather to J.C.

In interviews with Department social workers, mother denied any domestic violence or abuse of alcohol by father V. During various visits to the family home, mother was observed to have fresh injuries, including oval shaped bruises on her upper arms, a scab on the bridge of her nose, and a chipped tooth, for which she gave inconsistent explanations as to how they occurred or otherwise did not want to discuss them. She said the children were verbally disciplined, and she would spank them on their bottoms with an open hand. Mother conceded she was sad a lot, and said she thought she had post-partum depression. She volunteered that about two weeks earlier, she had walked into oncoming traffic because she was upset with father V., but she "snapped" out of it at the last second. She said father V. can sometimes drink 30 beers in one sitting, but she denied he acted aggressively when he drank.

---

[1]    All further undesignated section references are to the Welfare and Institutions Code.

[2]    The permanency planning hearing as to the youngest boy was still pending at the time mother filed her appeals.

2

Father V. denied abusing alcohol, stating he used to have a problem with alcohol but now he drank only on the weekends, perhaps eight to twelve beers. He denied using drugs or engaging in domestic violence with mother, and denied any knowledge of mother having suicidal thoughts. Father V.'s 16-year-old son from a prior relationship, who also lived in the home, reported the children were not physically abused or "beat." He said J.C. often cried and got upset when father V. and mother argued.

Mother reported she had no contact with and did not know the whereabouts of Jorge C. (father C.), the biological father of J.C.[3]

On December 21, 2012, the Department filed a petition pursuant to section 300, subdivisions (a) and (b), alleging J.C. and A.V. were at serious risk of physical harm due to physical altercations between mother and father V. in the children's presence, mother's emotional and mental health issues, and father V.'s abuse of alcohol.

In the detention report, the Department reported the "parents have not provided sufficient information regarding relatives for placement consideration." An addendum report indicated the same. At the detention hearing, the court ordered the children detained. J.C. and A.V. were detained in separate foster homes.

In the jurisdiction and disposition report, the case worker reported a further interview with mother on January 30, 2013, in which mother again "indicated that there are no relatives to consider for placement. The mother did not want to give this [social worker] any information about her relatives indicating that she has lost contact with her parents and sisters." Mother reported they lived in Mexico. The social worker further reported that father indicated "he has no relatives to consider for placement."

However, at some point before the March 5, 2013 disposition hearing, the social worker apparently learned from father V.'s 16-year-old son that mother "lied" about having no contact with her parents because she had spoken to them recently on the phone. He confirmed however that mother did not get along with her family. The social worker

---

[3]     Neither father V. or father C. are parties to this appeal.

3

asked mother if she could have the phone number for her parents. Mother reiterated her relationship with her parents was "strained." She disclosed only their names (B.A. and I.A.). The report does not indicate that any other identifying information was disclosed, nor does it report if any further efforts were made by the social worker to determine the whereabouts of the maternal relatives.

Mother continued to deny any problems in the home. The social worker told mother that neighbors reported hearing arguments and what sounded like physical altercations in the home and children crying. Mother said she was just "play-fighting" with father V. She denied she needed any mental health treatment, and denied having suicidal thoughts, although she admitted she was still sad a lot and sometimes slept all day.

The Department was able to locate father C. He was advised of the proceedings and indicated he had not had any contact with mother or J.C. and wished to waive reunification services.

On March 5, 2013, the court sustained the petition as alleged. The court ordered reunification services and monitored visitation with the boys for mother and father V.

In August 2013, the Department reported that mother was pregnant and that mother said father V. was the father of the baby. Mother had enrolled in programs, but father had not, explaining that he worked six days a week and could not do so. Both parents were "inconsistent" with visits. Mother suffered a black eye and when asked about it by the social worker, she claimed to have fallen in the shower.

In early September 2013, J.C. and A.V. were placed together in the home of foster mother, Ms. D. Around this same time, mother gave birth to her third son, M.V.

On September 27, 2013, the Department filed a petition pursuant to section 300, subdivisions (a), (b) and (j) as to M.V., who was less than one month old. The petition alleged M.V. was at risk due to domestic violence in the home and father V.'s alcohol abuse. The petition as to M.V. was sustained on October 21, 2013 as to the subdivision (j) allegations, and M.V. placed in foster care. The court ordered reunification services and monitored visitation for mother and father V. The court also

4

extended services for mother as to J.C. and A.V., but terminated services as to father V. and father C. as to the two older boys.

In March 2014, M.V. was moved to the foster home of Ms. D. In a supplemental April 2014 report, the Department noted the three boys were doing well in the home of Ms. D, a stay-at-home mother who was "providing a warm, nurturing and responsive home environment" beneficial to the developmental needs of the children. Ms. D. was ensuring the two older boys who had special needs were attending regular therapy sessions.

A contested 18-month review hearing was originally set as to J.C. and A.V. for June 25, 2014. The hearing date was continued to October 20, 2014, to be held concurrently with the 12-month status review for M.V. During this time period, mother was granted an additional six months of services.

In June 2014 and again in August 2014, the Department submitted status reports noting that the three children were continuing to do well in the care of Ms. D., and that while mother had completed a domestic violence course and was attending individual counseling for anger and depression, her visits with the children remained "sporadic." When she did visit, she had difficulty interacting with and supervising all three children during the monitored visits.

It is not clear on what date the maternal grandparents and maternal aunt came forward to request consideration for placement. There is evidence the Department performed a Live Scan on all three adult relatives, sometime in early October 2014, just before the continued review hearing on October 20, 2014 (almost two years after the two older boys were detained). There was no reported criminal history for any of the three maternal relatives. A last minute information was submitted to the court advising of same.

The contested 18-month review hearing for J.C. and A.V. was held on October 20, 2014. Mother requested the two boys be returned to her custody or, alternatively, that the court extend her reunification services for another six months. Counsel for the minors objected, arguing that mother had already received 22 months of services, had failed to

5

take advantage of her visits with the boys and had not fully complied with services. The court agreed and terminated reunification services for mother as to J.C. and A.V., explaining mother's record of visitation was "just dismal." The court also focused on the fact the two boys had special needs, including speech therapy to address developmental delays, and needed "much attention" which the foster mother had been consistently supplying. The court set the permanency planning hearing for J.C. and A.V. for February 13, 2015.

The October 20 hearing proceeded as the 12-month review for M.V., the youngest child. Mother requested M.V.'s placement be changed to the maternal relatives. Counsel for the minors again objected, arguing the three children were a "sibling group" and the maternal relatives had only recently come forward. The court ordered the Department to evaluate the maternal relatives, without making any changes in placement. The parties refer to this ruling as the "do not remove" order.

At the conclusion of the October 20 hearing, mother also asked that the court consider a change of placement for J.C. and A.V. to the home of the maternal relatives. The court denied mother's request to evaluate any change of placement as to J.C. and A.V., explaining that "[i]f the children have to be moved, then, of course, the Department is obligated to evaluate relatives. The preference time has passed."

The maternal grandparents began weekly visits with the children, monitored by Ms. D, in November 2014.

In preparation for the December 15, 2014 contested review hearing regarding M.V., the Department reported Ms. D. had an approved adoptive home study and recommended the three boys be deemed a "sibling set" and not separated. In a separate last minute information prepared to update the court on mother's progress and the Department's evaluation of the maternal relatives for "possible placement" of M.V., the social worker reported she had spoken with the relatives about their living situation. They said they lived in a "converted garage" but would relocate if necessary. The maternal grandparents expressed strong interest in having all three boys. The social

6

worker recommended continued visitation to allow them to attempt to develop a bond with the boys, and noted that an ASFA[4] home evaluation was pending.

At the December 15, 2014 hearing, mother reiterated her oral request for the court to consider a change in placement for all three boys to the maternal relatives, conceding they had not come forward earlier but explaining "they were residing in Mexico until a few months ago which is now why they are coming forward, but they are now requesting placement at this time." After argument, the court denied the request, and terminated reunification services as to M.V. A permanency planning hearing was set as to M.V. for April 20, 2015. The court also found the three boys to be a "sibling set."

On February 13, 2015, the court granted Ms. D's application to be deemed a de facto parent as to all three boys. The section 366.26 hearing for J.C. and A.V. was continued to February 26, 2015 to resolve potential problems with notice as to the two fathers.

Prior to the February 26, 2015 hearing, the Department provided a last minute information to the court explaining that Ms. D. had reported the visits with the maternal grandparents had "gone well." Since coming forward, they had visited a total of 11 times. The grandparents had moved to a one-bedroom apartment in San Bernardino and the social worker reported they had set up the one bedroom as a room for the three boys. They continued to express strong interest in obtaining permanent custody of the boys. The ASFA home assessment was still pending. On the same day, the Department reported that Ms. D. was facilitating the visits with the maternal relatives and was "open" to "ongoing contact" with the birth family after adoption. The three boys were reported as "well-adjusted and happy."

---

**4**    ASFA is the acronym for Adoption and Safe Families Act of 1997, which establishes the federal guidelines for foster care and relative care placements. (*In re Darlene T.* (2008) 163 Cal.App.4th 929, 932, fn. 1.)

In the section 366.26 report for J.C. and A.V., the Department reported the boys had a "genuine" and "loving bond" with Ms. D. Mother's visits remained inconsistent. The Department recommended adoption as the permanent plan.

Mother filed a section 388 petition on February 19, 2015, requesting placement of all three boys in the home of the maternal relatives because it was in their best interest to be with family. Mother contested the court's "do not remove" order issued October 20, 2015, and explained that the maternal relatives "only discovered the children were placed in foster care very recently." The petition stated the maternal grandparents were visiting with the children weekly, were interested in placement of all three boys, and that their "ASFA referral" remained pending.

The court summarily denied mother's section 388 petition at the hearing on February 26, 2015. The court explained it had previously addressed the issues surrounding the maternal grandparents, the time for the relative preference had "ended," and no change in circumstances was presented in the petition. The court denied mother's petition, noting that the best interest of the children would not be promoted by the proposed change in the placement order.

The section 366.26 hearing as to J.C. and A.V. was set for contest on April 20, 2015. After hearing brief testimony from mother and maternal grandfather about their visits with the boys, the court entertained argument from counsel. The court then ordered termination of parental rights as to J.C. and A.V. The court explained it appeared the monitored visits with the boys had gone well when mother showed up, but there was insufficient evidence to meet the beneficial parent-child relationship exception. (§ 366.26, subd. (c)(1)(B)(1).) The contested permanency planning hearing as to M.V. was continued to August 18, 2015.

Mother filed timely notices of appeal as to both the February 26, 2015 denial of her section 388 petition (case No. B262458), and the April 20, 2015 order terminating parental rights as to J.C. and A.V. (case No. B264023). The appeals were consolidated under docket No. B262458 by order of this court on July 21, 2015.

8

## DISCUSSION

### 1. Denial of the Section 388 Petition

Mother contends the juvenile court abused its discretion by summarily denying her section 388 petition requesting a change in placement of her three minor children to the custody of her relatives. Mother's argument is two-fold. First, she contends the Department failed to discharge its statutory duty to investigate the whereabouts of her relatives, which resulted in them not receiving timely notice to seek custody of the boys at an earlier point in the proceedings when the relative placement preference of section 361.3 applied. Second, mother contends that when the maternal relatives came forward in the fall of 2014, the Department failed to evaluate, in good faith, the maternal relatives as caretakers for the three boys, and that the juvenile court erred in concluding the relative placement preference no longer applied.

Counsel for the minors argues the Department should have been more diligent in locating and evaluating the maternal relatives, but strenuously opposes a reversal, arguing it is not in the best interests of the boys to be disrupted from the stable home environment they have with Ms. D.

The Department also argues for affirmance of the court's order, arguing the juvenile court acted within its lawful discretion in summarily denying the petition, and concluding a change of placement was not in the best interests of the boys given the late stage of the proceedings.

We review an order on a section 388 petition for abuse of discretion. (*In re Stephanie M*. (1994) 7 Cal.4th 295, 318-319 (*Stephanie M*.).) We conclude the juvenile court acted well within its discretion in denying mother's section 388 petition.

In presenting her petition, mother bore the burden of proving it was in the best interests of the children for the court to order a change in placement in February 2015 to the custody of the maternal grandparents, despite their stable long-term placement in the home of Ms. D. (*Stephanie M*., *supra*, 7 Cal.4th at p. 325.) Because of the late stage of the proceedings at which mother's petition was presented, this was a difficult burden to overcome.

9

"In any custody determination, a primary consideration in determining the child's best interests is the goal of assuring stability and continuity. [Citation.] '*When custody continues over a significant period, the child's need for continuity and stability assumes an increasingly important role*. That need will often dictate the conclusion that maintenance of the current arrangement would be in the best interests of that child.' [Citations.]" (*Stephanie M.*, *supra*, 7 Cal.4th at p. 317, italics added.) "The linchpin of a section 361.3 analysis is whether placement with a relative is in the best interests of the minor." (*Alicia B. v. Superior Court* (2004) 116 Cal.App.4th 856, 862-863.) Our Supreme Court has explained that "regardless of the relative placement preference, *the fundamental duty of the court is to assure the best interests of the child, whose bond with a foster parent may require that placement with a relative be rejected*." (*Stephanie M.*, at p. 321, italics added.)

Moreover, a hearing on a section 388 petition need only "be held if it appears that the best interests of the child may be promoted by the proposed change of order, which necessarily contemplates that a court need not order a hearing if this element is absent from the showing made by the petition." (*In re Zachary G.* (1999) 77 Cal.App.4th 799, 806-807; accord, *Cesar V. v. Superior Court* (2001) 91 Cal.App.4th 1023, 1035-1036 (*Cesar V.*).) With these standards in mind, we address both aspects of mother's argument.

Mother's section 388 petition does not expressly assert a failure by the Department to investigate the whereabouts of the maternal relatives, but does assert, by implication, that their late appearance in the proceedings was not the result of lack of interest, but lack of notice as to the existence of the dependency proceedings; a fact mother contends was disregarded by the juvenile court in ruling on her petition.

Section 309, subdivision (e)(1) provides in relevant part: "If the child is removed, the social worker shall conduct, within 30 days, an investigation in order to identify and locate all grandparents, adult siblings, and other adult relatives of the child, as defined in paragraph (2) of subdivision (f) of Section 319, including any other adult relatives suggested by the parents." Section 361.3, subdivision (a) provides, in relevant part: "In

10

any case in which a child is removed from the physical custody of his or her parents pursuant to Section 361, preferential consideration shall be given to a request by a relative of the child for placement of the child with the relative, regardless of the relative's immigration status."

By statute, the Department is thus obligated, in the event of removal and detention of a dependent child, to investigate the identity and location of suitable adult relatives as possible caretakers for the child. If an adult relative is identified or comes forward voluntarily before disposition, the relative placement preference of section 361.3 applies. The statute does *not* create an evidentiary presumption that placement with a relative is in the child's best interest. (*Stephanie M*., *supra*, 7 Cal.4th at p. 320.) But, it does mandate that an available adult relative be the first placement "considered and investigated." (§ 361.3, subd. (c)(1); see also *In re Joseph T*. (2008) 163 Cal.App.4th 787, 798 (*Joseph T*.) [the relative placement preference "is not a relative placement *guarantee*"].)

Mother relies heavily on *In re R.T*. (2015) 232 Cal.App.4th 1284 (*R.T*.). There, a baby boy was exposed in vitro to numerous illicit drugs. (*Id*. at p. 1292.) Within days of the child's birth and detention, the father gave the agency the names and addresses of two of his sisters and requested they be considered for placement. (*Id*. at p. 1293.) Despite being given this information, the agency failed to give notice to the two paternal aunts of the proceedings in violation of section 309. (*R.T.,* at p. 1296.) The minor was detained with the father's former girlfriend. Within two weeks, the paternal aunts voluntarily came forward and requested placement. (*Id*. at p. 1293.) The paternal aunts were evaluated and both of their homes were approved by the time the minor was just three months old. (*Ibid*.) However, the agency advised the aunts and reported to the juvenile court that neither home was considered for placement because there were no plans to move the minor from his current nonrelative placement. (*Id*. at p. 1297.) At the hearing on the aunts' petition for a modification of the placement order, the social worker testified that they evaluate relatives for placement but they "do not receive preference" (*id*. at p. 1294) in contravention of the plain language of section 361.3. The reviewing court therefore found the agency had failed to abide by its statutory obligations, and the

11

juvenile court had abused its discretion in failing to apply the correct legal standards regarding the relative placement preference. (*R.T.*, at pp. 1299-1300.)

The facts here are not in any way similar to *R.T.* From the beginning of the dependency proceedings in December 2012, mother asserted there were no relatives available for placement, and resisted repeated inquiries from the social workers about contact information. She claimed she had no contact with her parents and her sisters, they lived in Mexico, and her relationship with them was "strained." Father also stated he had no relatives available for placement. J.C. and A.V. were therefore placed in non-relative foster homes following their detention.

At some point prior to the March 2013 disposition hearing for J.C. and A.V., father V.'s 16-year-old son reported that mother was lying about contact with her parents because he believed mother had recently spoken to them by phone, but he confirmed she did not have a good relationship with them. Mother apparently then disclosed the names of her parents to the Department, but she refused to disclose any telephone number she may have had for them.

After M.V.'s birth and detention in September 2013, the Department still had only the maternal grandparents' names and no other identifying information. M.V. was therefore also detained in a nonrelative foster placement. By March 2014, all three boys were living together in the home of Ms. D, who was interested in adoption.

We are not persuaded by the argument of minors' counsel that the Department's alleged failure to investigate the grandparents' whereabouts is proven by a "white pages" internet search performed *in 2015* which revealed the grandparents' current address in San Bernardino. As late as the December 15, 2014 hearing, mother advised the court on the record that the reason the maternal relatives had not come forward sooner was because they had been living *in Mexico*. The fact the grandparents' California address was easily discovered in 2015 *after* they had moved from Mexico is not relevant to what information would have been necessary to locate the grandparents *in Mexico* at the time of detention in 2012 and 2013 with only the names to conduct a search. The record simply does not support the assertion that the Department could have easily located the

12

maternal relatives earlier in the proceedings had it more vigorously sought to obtain information on their whereabouts. Rather, the record shows that despite repeated inquires, mother thwarted the Department's efforts to obtain relevant information to facilitate notice to her available relatives, and mother apparently chose not to tell them of the proceedings herself. Mother's petition did not demonstrate the Department failed to comply in good faith with the statutory mandate of section 309.

Further, mother's petition did not show any violation of the relative placement preference after the maternal relatives came forward sometime in October 2014 on the eve of the court's termination of reunification services.

The courts concur in finding the relative placement preference set forth in section 361.3 unequivocally applies from detention through the disposition hearing. There is a split of authority however, on whether it applies during the entire reunification period, and through termination of parental rights. (*R.T.*, *supra*, 232 Cal.App.4th at p. 1300.)

The statute reads: "Subsequent to the hearing conducted pursuant to Section 358, *whenever a new placement of the child must be made*, consideration for placement shall again be given as described in this section to relatives who have not been found to be unsuitable and who will fulfill the child's reunification or permanent plan requirements. In addition to the factors described in subdivision (a), the county social worker shall consider whether the relative has established and maintained a relationship with the child." (§ 361.3, subd. (d), italics added.)

Some courts have interpreted this statutory language to mean the preference applies after the disposition hearing *only* when a change in placement becomes necessary. (See, e.g., *In re Lauren R.* (2007) 148 Cal.App.4th 841, 854-855 (*Lauren R.*); see also *Cesar V.*, *supra*, 91 Cal.App.4th at pp. 1031-1032.)

But, another court has found the preference applies throughout the entire reunification period and up until termination of parental rights, *whenever an adult relative comes forward and requests placement*, irrespective of whether the child is in a stable, acceptable placement and no change in placement is indicated. (*Joseph T.*, *supra*, 163 Cal.App.4th at pp. 794-795.) The panel in *Joseph T.* was divided however, with the

13

dissent finding that the statutory language and legislative history supported the conclusion the preference applied post-disposition *only* when a change in placement was required. (*Id*. at pp. 799-800, conc. & dis. opn. of Mallano, J.)

The juvenile court followed the reasoning of *Lauren R*. In so doing, the juvenile court did not disregard the relative placement preference, despite mother's argument to the contrary. The maternal relatives did not assert their interest in placement to the court until the review hearing on October 20, 2014. At that time, it had been almost two years since the two older boys were detained, over a year since disposition, mother had failed to reunify despite the provision of 22 months of services, and all three boys were in a stable placement in the home of Ms. D., who was interested in adoption. Nothing in the record indicated, at that time, that a change in placement for any of the boys was warranted.

During the October 20 hearing, minors' counsel strenuously argued against any change in placement. Noting mother's "dismal" visitation record, the court terminated reunification services as to J.C. and A.V., and set a permanency planning hearing. Despite the late stage of the proceedings, the court nonetheless ordered the Department to evaluate the maternal relatives as a placement option for M.V., and for J.C. and A.V. in the event a change in placement became necessary. Mother cites no authority or argument for how the court's order amounted to an abuse of discretion when it was consistent with valid authority interpreting the preference as applying post-disposition *only* when a change in placement becomes necessary. (*Lauren R*., *supra*, 148 Cal.App.4th 841; *Cesar V.*, *supra*, 91 Cal.App.4th 1023.)

In addition, the court ordered no change in placement for any of the boys absent a court order or an emergency. Mother suggests this "do not remove" order also reflects the court's disregard of the preference, but mother cites no authority requiring the court to immediately order a change in placement *before* the Department had completed an evaluation of the maternal relatives.

Thereafter, in accordance with the court's order, the Department arranged a visitation schedule for the maternal grandparents and continued its evaluation of the

14

grandparents as a placement option.  In December 2014, the contested review hearing for M.V., the youngest boy, was held.  Minors' counsel again argued against any change in placement.  The court terminated reunification services for M.V. and set a permanency planning hearing.  Once again, the court, in accordance with applicable law, ordered that the Department should continue its evaluation and look to the maternal grandparents as a placement option in the event a change became necessary.

Mother did not file her section 388 petition requesting a change in placement until February 2015, on the eve of the permanency planning hearings, and more than three months after the court terminated reunification services for all three boys.  The boys had been living together and thriving in the home of Ms. D for a significant period and were strongly bonded to her.

Mother nonetheless contends that in summarily denying her petition, the court failed to take into account the statutory factors relevant to the preference (§ 361.3, subd. (a)), and ruled solely on the basis that reunification services had been terminated.  The record belies mother's contention that the court only considered the fact that the reunification period was over.  The court plainly considered the late stage of the proceedings, the fact that the boys were doing well in the home of Ms. D., and nothing indicated a change in placement was warranted, factors appropriately given significant weight.

As our Supreme Court has explained, the "Legislature has declared that a dependent child has an interest in continuity and stability in placement."  (*Stephanie M*., *supra*, 7 Cal.4th at p. 326.)  "After the termination of reunification services, the parents' interest in the care, custody and companionship of the child are no longer paramount.  Rather, at this point 'the focus shifts to the needs of the child for permanency and stability' [citation], and in fact, there is a rebuttable presumption that continued foster care is in the best interests of the child."  (*Id*. at p. 317.)  While the record shows the maternal grandparents appeared to be a loving couple genuinely interested in obtaining custody of the three boys, "the fundamental duty of the court is to assure the best interests of the child, whose bond with a foster parent may require that placement with a relative

15

be rejected." (*Id.* at p. 321, italics added.)  That mandate, along with the late stage of the proceedings, required a significant showing by mother to overcome her burden.  It was reasonable for the juvenile court to conclude that mother's petition failed to demonstrate any reasonable likelihood that imposing a change in placement so late in the proceedings was in the best interests of the three boys.

**2.      Termination of Parental Rights**

Mother tells us her appeal of the order terminating her parental rights was raised only to preserve her rights with respect to her related appeal of the denial of her section 388 petition.  She does not raise separate, substantive arguments against the termination of her parental rights, arguing only that if she is successful on the appeal of the placement order, the order terminating parental rights must be reversed as well.  Because we have already determined that the juvenile court's order denying mother's section 388 petition is properly affirmed, no further discussion of the appeal from the order terminating parental rights to J.C. and A.V. is warranted.

## DISPOSITION

The juvenile court's order of February 26, 2015 denying mother's section 388 petition, and the court's order of April 20, 2015 terminating parental rights as to the minors J.C. and A.V. are affirmed.

GRIMES, J.

WE CONCUR:

BIGELOW, P. J.

FLIER, J.

16